Christopher W. Arledge (Bar No. 200767)
carledge@onellp.com
**ONE LLP**
4000 MacArthur Boulevard
East Tower, Suite 500
Newport Beach, California 92660
Telephone:  (949) 502-2870
Facsimile:  (949) 258-5081

William J. O'Brien (Bar No. 99526)
wobrien@onellp.com
**ONE LLP**
9301 Wilshire Boulevard
Penthouse Suite
Beverly Hills, California 90210
Telephone:  (310) 866-5158
Facsimile:   (310) 943- 2085

Attorneys for Plaintiff, Operation Technology, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPERATION TECHNOLOGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> CYME INTERNATIONAL T & D INC.; INTERNATIONAL POWER ELECTRIC TECHNOLOGY CO.; AMIR ASLANI; and DOES 1-20, <br><br> Defendants. | Case No.  8:14-cv-00999 <br><br> **COMPLAINT FOR FALSE AND MISLEADING REPRESENTATIONS IN VIOLATION OF THE LANHAM ACT** <br><br> **WITH DEMAND FOR JURY TRIAL** |

1
**COMPLAINT**

Plaintiff, Operation Technology, Inc., alleges:

## JURISDICTION AND VENUE

1.     This is a civil action for violation of the federal Lanham Act, 15 U.S.C. § 1125(a) *et seq.*  This Court has subject matter jurisdiction under 28 U.S.C. § 1338(a) and 15 U.S.C. § 1121.

2.     Venue is proper in the Central District of California under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(a) because the claims arise in this District, the Defendants transact business in this District, and the injury suffered by Operation Technology took place in this District.

3.     Defendants are subject to personal jurisdiction in this Court because of their contacts with the State of California and with this District.  These contacts have included substantial sales of the relevant products in this District and in the State of California and Defendants' commission of intentional acts expressly aimed at this District, causing harm that the Defendants knew was likely to be suffered in this District.

## OPERATION TECHNOLOGY, INC., AND ITS ETAP SOFTWARE

4.     Operation Technology, Inc. ("ETAP") is a corporation duly organized and existing under the laws of the State of California.  Founded in 1986, ETAP is headquartered in Irvine, California.

5.     Although ETAP is a relatively small company with some 200 employees, it has earned the position of global market and technology leader in developing and marketing software to design, analyze, optimize, and control electrical power systems, including electrical generation plants, electrical transmission systems, electrical distribution systems, and industrial power systems.

6.     ETAP markets its power engineering software under the trademark ETAP® (Electrical Transient Analyzer Program).  ETAP software products ensure that power systems are designed for optimal reliability, safety, and energy efficiency.  When deployed in real-time mode, they enable organizations to manage energy as a strategic asset,

maximize system utilization, lower costs, and achieve higher levels of financial stability. To date, ETAP has sold more than 50,000 software licenses to companies around the world.

ETAP's software is the only power engineering software that is suitable for use as a mission-critical part of high-impact systems such as nuclear power plants.  For example, ETAP software is the only commercially available power engineering software designed and manufactured under a quality assurance program complying with the U.S. Nuclear Regulatory Commission's Quality Assurance Criteria for Nuclear Power Plants and Fuel Reprocessing Plants, 10 C.F.R. § 50 Appendix B.  ETAP's reputation for extremely high reliability is an important part of its ongoing success and provides an important competitive advantage for ETAP over CYME.

## THE DEFENDANTS

7.     Defendant Cyme International T & D Inc. ("CYME") competes with ETAP in developing and marketing power engineering software.

8.     CYME is a corporation organized under the laws of Canada, with its headquarters in St-Lazare-De-Bellechasse, Quebec.  CYME also has offices in Burlington, Massachusetts.  ETAP is informed and believes, and on that basis alleges, that CYME is a wholly-owned subsidiary of Cooper Power Systems, LLC, a global manufacturer and provider of power delivery products and services for the utility, commercial, and industrial markets, with some 100,000 employees worldwide.  CYME is an indirect subsidiary, via Cooper Power Systems, of Eaton Corporation plc, a large multinational corporation that is incorporated under the laws of Ireland and whose stock is traded on the New York Stock Exchange.

9.     ETAP is informed and believes, and on that basis alleges, that CYME does business around the world and throughout the United States, including in this District and elsewhere in the State of California.  CYME sells its power engineering software in this District and elsewhere in the State of California.

10.     Defendant International Power Electric Technology Co. ("IPET-CO") is a business organization whose form is currently unknown to ETAP.  IPET-CO claims to be CYME's "[s]ole sales and technical representative in Turkey and Middle East including GCC countries" and to be "[a]uthorized for sales, training & technical support for of all CYME Software Package[s]."  According to its website, IPET-CO is based in Istanbul, Turkey, and Ras al-Khaimah in the United Arab Emirates.

11.     Defendant Amir Aslani is an individual and is Manager of IPET-CO.  Aslani's present residence is unknown to ETAP.  ETAP is informed and believes, and on that basis alleges, that Aslani operates and controls IPET-CO.  Aslani acts as a sales agent for CYME in Turkey and the Middle East.

12.     ETAP is informed and believes, and on that basis alleges, that all conduct of Aslani alleged in this Complaint was conducted on behalf of IPET-CO and CYME and in the course and scope of Aslani's employment by, or agency for, IPET-CO and CYME. IPET-CO and CYME are responsible for Aslani's conduct under the legal doctrine of *respondeat superior*.

13.     ETAP is informed and believes, and on that basis alleges, that the conduct of Aslani, IPET-CO, and Does 1 through 20 as alleged below was directed, encouraged, supervised, assisted, controlled, and ratified by CYME.  Support for this belief includes, without limitation, the following:

a.     CYME has directly circulated false and misleading representations generated by Aslani, IPET-CO, and Does, including sending at least one of their false and misleading messages directly to at least one customer of ETAP, as is detailed below.

b.     CYME has a history of making false statements about ETAP software, as is detailed below.

c.     Although IPET-CO's sales territory is limited to Turkey and the Middle East, Defendants' ongoing campaign of false and misleading statements about ETAP has been carried out in many other parts of the world as well, including the United States,

Europe, South America, and India.  Information identifying customers for power engineering software in those other parts of the world would normally be in the possession of CYME but not of Middle Eastern regional sales agents like Aslani and IPET-CO. Deceiving customers in those other parts of the world into buying CYME products would benefit CYME but not Aslani and IPET-CO.

        d.     Based on normal business practices, technical analyses such as the deceptive test reports described below would normally be prepared by sophisticated power engineers with software design expertise—such as CYME—rather than by a sales representative like IPET-CO.

        e.     Based on information and belief as to normal business practices, CYME has the legal right and practical ability to control representations by its sales representative IPET-CO and IPET-CO's manager Aslani about CYME's products and competing products, such as ETAP software.  ETAP has notified CYME about deceptive conduct by Aslani and IPET-CO (as detailed below), but CYME has evidently taken no action to stop Aslani or IPET-CO from continuing such conduct.  This provides further evidence of CYME's approval and ratification of the ongoing deception campaign.

    14.    ETAP does not know the true names and capacities of the Defendants sued as Does 1 through 20 ("Does") and therefore sues them using fictitious names.  ETAP is informed and believes, and on that basis alleges, that each of Does participated in, directed, supervised, controlled, or ratified the conduct complained of below or is legally responsible in some manner for that conduct, and that ETAP's damages as alleged below were proximately caused by Does.

    15.    ETAP is informed and believes, and on that basis alleges, that, in doing the things alleged in this Complaint, each Defendant acted as part of an agreement and conspiracy with the other Defendants to do the things alleged in this Complaint; acted as the employee, agent, joint venturer, or co-conspirator of each other Defendant; and acted with the consent, encouragement, assistance, and ratification of each other Defendant.

**DEFENDANTS' MISREPRESENTATIONS**

16.     Beginning no later than June 30, 2013, and continuing through at least May 19, 2014, Defendants have engaged in an aggressive campaign to deceptively promote their own power engineering software to customers and potential customers around the world by falsely and misleadingly portraying ETAP products as defective, as dangerous, and as having damaged ETAP customers.  Posing as independent test engineers, Defendants have published numerous false and misleading emails, reports, and videos that purport to disclose defects in and failures of ETAP software.

**Defendants' Impersonations of Independent Test Engineers and Customers**

17.     In carrying out their deceptive campaign, Defendants have concealed their true identities, instead masquerading as independent evaluators of power engineering software and as dissatisfied former customers of ETAP.

18.     Defendants' masquerades have included creating the appearance of an organization—which does not really exist—called "Independent Power Engineers." Confirmation that "Independent Power Engineers" is really a concoction by Defendants includes, without limitation:

a.     The metadata in PDF files attached to emails from "Independent Power Engineers" that purportedly reported on its testing of ETAP products showed the author of those documents to be "Aslani."  (This metadata was changed on later versions of the same documents.)

b.     The domain name for the "Independent Power Engineers" website, www.ipengineers.net, was originally registered to someone using the name "stan" and the email address stan.3626@gmail.com.  As is described below, that same name and email address were used by someone who falsely posed as a dissatisfied ETAP customer and purported to respond to an email from "Independent Power Engineers."  Further, some of the PDF files posted on the "Independent Power Engineers" website and attached to

"Independent Power Engineers" emails list "Stan" as the author.

       c.    Instead of conducting impartial tests on software from various companies, "Independent Power Engineers" has focused on publishing highly biased reports of purported tests on ETAP—at least 24 of them.  In these reports, "Independent Power Engineers" goes to great lengths to create a false and misleading impression that ETAP is defective and prone to failure, as is detailed below.

       d.    ETAP is informed and believes, and on that basis alleges, that Amir Aslani has followed up emails to ETAP customers with telephone calls to offer those same customers discounts on CYME's competing software.

19.    Beginning no later than June 30, 2013, Defendants began sending pseudonymous emails attacking ETAP software in the name of "powersystem engineer" from the email address powersystem.expertengineer@gmail.com.

20.    Beginning no later than July 2, 2013, Defendants began sending pseudonymous emails attacking ETAP software in the name of "Independent Power.Engineers" from the email address independent.power.engineers@gmail.com.

21.    Beginning no later than December 19, 2013, Defendants began sending pseudonymous emails attacking ETAP software in the name of "Electric Software Validating Team" from the email address validating.elec.software@gmail.com.

22.    Defendants' pseudonymous emails have included, without limitation, the following:

       a.    On or about June 30, 2013, and March 14, 2014, Defendants sent an email entitled "Calculation problems in ETAP load flow and Motor starting algorithms," in the name of "Power System Expert Engineer," from the email address powersystem.expertengineer@gmail.com.  Recipients of this email included, without limitation, ETAP customers in the United States, the United Arab Emirates, India, and the Philippines.

b.      On or about July 2, 2013, Defendants sent an email entitled "ETAP Newton Raphson Algorithm failed on first four tests," in the name of "Independent Power Engineers," from the email address independent.power.engineers@gmail.com.  Recipients of this email included, without limitation, ETAP customers in India, Australia, and France.

c.      On or about July 29, 2013, Defendants sent an email entitled "ETAP 12, Adaptive Newton Raphson Algorithm, dose it failed again in test!? [sic]," in the name of "Independent Power Engineers," from the email address independent.power.engineers@gmail.com.  Recipients of this email included, without limitation, an ETAP customer in India.

d.      On or about August 5, 2013, Defendants sent an email entitled "Wrong results in ETAP up to version 12 and jumping voltage more than 50% in 4 simplified real test cases," in the name of "Independent Power Engineers," from the email address independent.power.engineers@gmail.com.  Recipients of this email included, without limitation, an ETAP customer in Bulgaria.

e.      On or about December 19, 2013, Defendants sent an email entitled "ETAP Software, Warning to avoid having wrong results," in the name of "Electric Software Validating Team," from the email address validating.elec.software@gmail.com. On information and belief, this email was sent by Defendants in the name of another non-existent entity an attempt to conceal the source of the previous emails attacking ETAP. Recipients of this email included, without limitation, an ETAP customer in India.

f.      On or about March 14, 2014, Defendants sent an email entitled "Critical calculation problems in ETAP software," in the name of "Independent Power Engineers," from the email address independent.power.engineers@gmail.com.  Recipients of this email included, without limitation, ETAP customers in the United States, the United Arab Emirates, Turkey, the Balkans, Columbia, and India.

g.      On or about April 21, 2014, Defendants sent an email entitled "Wrong result in Transient stability algorithm of ETAP 12.6 [sic]," in the name of "Independent

Power Engineers," from the email address independent.power.engineers@gmail.com.
Recipients of this email included, without limitation, an ETAP customer in the United Arab
Emirates.

        h.      On or about May 19, 2014, Defendants sent an email entitled "ETAP
Transient stability issue, case 00081& web seminars about technical issues in the power
system study software's including open discussion," in the name of "Independent Power
Engineers," from the email address independent.power.engineers@gmail.com.  Recipients
of this email included, without limitation, an ETAP customer in the United Arab Emirates.

      23.    Defendants' campaign of deception has also included posing as fictitious
dissatisfied former ETAP customers.  Examples include, without limitation, the following:

        a.      On information and belief, Defendants posed as a former ETAP
customer using the email address stan.3626@gmail.com.  In this guise, Defendants
pretended to respond to their own March 14, 2014 email entitled "Critical calculation
problems in ETAP software."  In the purported response, the purported former customer
says:

> Dear Independent Power engineers
>
>     Can you please inform us about the name of refinery has had
> black out because of Wrong results in ETAP transient stability ?
> we have had such problems in ETAP software and this is the
> reason we do not use ETAP software anymore.
>
>     Regards
>     Stan

        b.      On March 14, 2014, Bert Evangelista of CYME sent this fictitious email
from "Stan" to at least one ETAP customer and to at least two other recipients.

        c.      In reality, there is no ETAP customer as depicted in the email from
"stan.3626@gmail.com," and there is no refinery that had a blackout because of "Wrong
results in ETAP transient stability."

d.     On information and belief, "Stan" (also known as "stan" and "stan.3626@gmail.com") is either Amir Aslani or one of the Doe Defendants acting under his direction.  As confirmation of this, the domain name for the "Independent Power Engineers" website, www.ipengineers.net, was originally registered to "stan" at stan.3626@gmail.com.  Further, some of the PDF files posted on the "Independent Power Engineers" website and attached to "Independent Power Engineers" emails list "Stan" as the author.

e.     On information and belief, Defendants also posed as another former ETAP customer using the email address muhammad.uhji@gmail.com.  In this second guise, Defendants again pretended to respond to their own March 14, 2014 email entitled "Critical calculation problems in ETAP software."  In the purported response, the purported former customer claimed that his organization had experienced two shutdowns because of ETAP software and had replaced ETAP software about six months before.

f.     This fictitious response was sent to at least one ETAP customer.  But in reality, there is no such ETAP customer as depicted in the email from "muhammad.uhji@gmail.com."

24.     On information and belief, Defendants have sent false and misleading emails about ETAP to many other recipients and have made other false and misleading representations about ETAP software that are not presently known to ETAP.

25.     On September 3, 2013, Defendants registered the internet domain name www.ipengineers.net using the pseudonym "stan."  Defendants established a website at that address that appears to belong to an organization called "Independent Power Engineers." The website claims:

> IPE (Independent Power Engineers) is a nonprofit organization
> passionate about the power engineering industry.  Our main
> mandate is to test and expose the different issues and dysfunctions
> of different power system simulation softwares.  Please note that

10
**COMPLAINT**

1      all of our tests are made available also on YouTube for

2      transparency.  Look for Independent Power Engineers on YouTube

3      to get access to our latest videos.

4      26.    ETAP is informed and believes—for reasons including those set forth above—

5   that "Independent Power Engineers" is nothing more than a disguise for Defendants,

6   enabling them to deny responsibility for their deceptive attacks on ETAP and to gain

7   credibility for those attacks by concealing their true source and posing as an independent

8   non-profit organization.

9      27.    Defendants' website falsely purporting to belong to "Independent Power

10  Engineers" contains brief descriptions of multiple purported tests of ETAP software, in

11  which Defendants assert that Independent Power Engineers has found defects and failures

12  in ETAP software.  These purported tests include (in the order in which they appear on the

13  site):

14              a.      ETAP case 28

15              b.      ETAP case 11

16              c.      ETAP case 21

17              d.      ETAP case 22

18              e.      ETAP case 26-27

19              f.      ETAP case 23

20              g.      ETAP case 25

21              h.      ETAP case 24

22              i.      ETAP case 12

23              j.      ETAP case 13

24              k.      ETAP case 10

25              l.      ETAP case 7

26              m.      ETAP case 04

27              n.      ETAP case 03

28

1        o.    ETAP case 02

2        p.    ETAP case 01

3        q.    ETAP case 41

4        r.    ETAP case 46

5        s.    ETAP case 48

6        t.    ETAP case 49

7        u.    ETAP case 56

8        v.    ETAP case 58

9        w.    ETAP case 67

10       x.    ETAP case 81

11   28.    The purported "Independent Power Engineers" website includes links to

12   numerous files containing reports purporting to describe testing by Independent Power

13   Engineers of ETAP software.  These files include:

14       a.    IPE-ETAP CASE-0001.pdf

15       b.    ETAP CASE 001 File-can be used from Version 7.zip

16       c.    IPE-ETAP CASE-0002.pdf

17       d.    ETAP CASE 002 File-can be used from Version 7.zip

18       e.    IPE-ETAP CASE-0004.pdf

19       f.    ETAP CASE 004 File-can be used from Version 7.zip

20       g.    IPE-ETAP CASE-0007.pdf

21       h.    IPE-ETAP CASE-0011.pdf

22       i.    IPE-ETAP CASE-0012.pdf

23       j.    IPE-ETAP CASE-0021.pdf

24       k.    IPE-ETAP CASE-0022.pdf

25       l.    IPE-ETAP CASE-0023.pdf

26       m.    IPE-ETAP CASE-0024.pdf

27       n.    IPE-ETAP CASE-0025.pdf

28

**COMPLAINT**

o.     ETAP CASE 0025 File-can be used from Version 7.zip

p.     IPE-ETAP CASE-0026.pdf

q.     IPE-ETAP CASE-0027.pdf

r.     IPE-ETAP CASE-0028.pdf

s.     ETAP CASE 0028 File-can be used from Version 7.zip

t.     IPE-ETAP CASE-0039.pdf

u.     IPE-ETAP CASE-0040.pdf

v.     IPE-ETAP CASE-0041.pdf

w.     ETAP CASE 0041 File-can be used from Version 7.zip

x.     ETAP CASE 0041 File-can be used from Version 12.zip

y.     IPE-ETAP CASE-0042.pdf

z.     ETAP CASE 0042 File-can be used from Version 12.zip

aa.     IPE-ETAP CASE-0046.pdf

bb.     ETAP CASE 0046-12 file-can be used from version12.zip

cc.     IPE-ETAP CASE-0048.pdf

dd.     ETAP CASES 048-can be used from version 7.zip

ee.     ETAP CASE 0048-can be used from version 12.zip

ff.     IPE-ETAP CASE-0049.pdf

gg.     ETAP CASE 0049-can be used from version 7.zip

hh.     ETAP CASE 0049-can be used from version 12.zip

ii.     IPE-ETAP CASE-0056.pdf

jj.     IPE-ETAP CASE-0058.pdf

kk.     IPE-ETAP CASE-0067.pdf

ll.     IPE-ETAP CASE-0081.pdf

29.     The purported "Independent Power Engineers" website also contains links to most of the videos on Defendants' deceptive "Independent.Power.Engineers" YouTube channel (described below).

30.     Defendants have created a YouTube channel called "Independent.Power.Engineers" falsely purporting that it belongs to Independent Power Engineers.  The videos posted on this deceptive channel include:

a.     "ETAP case 01" – posted 11 months ago

b.     "ETAP case 02" – posted 11 months ago

c.     "ETAP case 03" – posted 11 months ago

d.     "ETAP case 04" – posted 11 months ago

e.     "ETAP case 07" – posted 10 months ago

f.     "ETAP CASE 10" – posted 10 months ago

g.     "ETAP CASE 11" – posted 10 months ago

h.     "ETAP CASE 12" – posted 10 months ago

i.     "ETAP CASE 13" – posted 10 months ago

j.     "etap case 0021" – posted 9 months ago

k.     "etap case 0022" – posted 9 months ago

l.     "etap case 0024" – posted 9 months ago

m.     "etap case 0025" – posted 9 months ago

n.     "etap case 0026 27" [sic] – posted 9 months ago

o.     "etap case 0028" – posted 9 months ago

p.     "ETAP CASE 41" – posted 6 months ago

q.     "ETAP CASE 46" – posted 6 months ago

r.     "ETAP CASE 48" – posted 6 months ago

s.     "ETAP CASE 49" – posted 6 months ago

t.     "ETAP CASE 81" – posted 2 weeks ago

31.     In each of these videos, Defendants—masquerading as "Independent Power Engineers"—purport to disclose "bugs" or defects in ETAP software.

**Defendants' False and Misleading Representations**

32.     Defendants' emails, website postings, reports, and videos about ETAP software are replete with false and misleading representations.  The deceptive aspects of Defendants representations include, without limitation, the following.

33.     Defendants' pseudonymous email entitled "Calculation problems in ETAP load flow and Motor starting algorithms" was false and misleading in at least the following respects, without limitation:

        a.     It falsely purported to come from "Power System Expert Engineer."

        b.     Its title was false.

        c.     It falsely claimed that there were "big calculation problems in ETAP load flow and motor starting algorithms up to ETAP 11.1.1."

        d.     It attached false and misleading test reports.

34.     Defendants' pseudonymous email entitled "ETAP Newton Raphson Algorithm failed on first four tests" was false and misleading in at least the following respects, without limitation:

        a.     It falsely purported to come from "Independent Power Engineers."

        b.     Its title was false.

        c.     It claimed to be from "a nonprofit organization [that] is going to test all the power system analysis softwares."

        d.     It attached false and misleading test reports for ETAP Cases 1 through 4.

        e.     It provided links to false and misleading YouTube videos of those tests.

35.     Defendants' pseudonymous email entitled "Adaptive Newton Raphson Algorithm, dose it failed again in test!? [sic]" was false and misleading in at least the following respects, without limitation:

        a.     It falsely purported to come from "Independent Power Engineers."

        b.     Its title was false.

c.    It claimed that "we received more than 400 emails from over the world indicating they have problems in results of ETAP.  On information and belief, this claim is materially false.

d.    It attached a false and misleading test report for ETAP Case 7.

e.    It provided a link to Defendants' false and misleading YouTube videos.

36.    Defendants' pseudonymous email entitled "Wrong results in ETAP up to version 12 and jumping voltage more than 50% in 4 simplified real test cases" was false and misleading in at least the following respects, without limitation:

a.    It falsely purported to come from "Independent Power Engineers."

b.    Its title was false.

c.    It falsely and misleadingly claimed, "All of our cases are real cases that we have just simplified to very small cases."

d.    It attached false and misleading test reports for ETAP Cases 10 through 13.

e.    It encouraged readers to search for false and misleading "Independent Power Engineers" YouTube videos.

37.    Defendants' pseudonymous email entitled "ETAP Software, Warning to avoid having wrong results" was false and misleading in at least the following respects, without limitation:

a.    It falsely purported to come from "Electric Software Validating Team."

b.    Its title was misleading.

c.    It falsely and misleadingly claimed, "We did test more than 20 new cases in load flow, Motor starting and Transient stability and we confirm existing prblems in ETAP calculation engines ' Load Flow ' , 'Motor starting' and 'Transient stability' [sic]."

d.    It attached false and misleading test reports.

38.    Defendants' pseudonymous email entitled "Critical calculation problems in

ETAP software" was false and misleading in at least the following respects, without limitation:

        a.     It falsely purported to come from "Independent Power Engineers."

        b.     Its title was false.

        c.     It falsely and misleadingly claimed that there were "critical calculation problems in ETAP software for Transient stability, Dynamic motor starting and harmonic analysis."

        d.     It falsely and misleadingly claimed that, "after several studies, it has been proven that black out of one of the refineries in the U.S (2013), has been because of wrong results of ETAP software in transient stability.(This refinery has lost electricity of whole refinery for hours that temporarily halted operations at its 300,000 barrel per day and has lost millions dollars ) [sic]."   This claim about a refinery shut down because of ETAP is completely fictitious.

        e.     It falsely and misleadingly claimed, "these simple and small cases proves big hols [sic] in ETAP calculation engine that may make big problems in results."

        f.     It attached false and misleading test reports for ETAP Test Cases 1, 11, 26, 41, 48, and 49.

        g.     It provided links to Defendants' false and misleading YouTube videos for those same tests.

    39.    Defendants' pseudonymous email entitled "Wrong result inTransient stability algorithm of ETAP 12.6" was false and misleading at least the following respects, without limitation:

        a.     It falsely purported to come from "Independent Power Engineers."

        b.     Its title was false.

        c.     It purported to provide information and testing about Version 12.6 of ETAP's software.  In reality, that version had not yet been released and was not available for Defendants to inspect or test.

d.     It attached false and misleading test reports for "IPE-ETAP CASE-0058: Transient stability problem in ETAP" and"IPE-ETAP CASE-0049: Load Flow problem in ETAP."

e.     It provided a link to Defendants' false and misleading YouTube videos.

40.     Defendants' pseudonymous email entitled "ETAP Transient stability issue, case 00081& web seminars about technical issues in the power system study software's including open discussion" was false and misleading at least the following respects, without limitation:

a.     It falsely purported to come from "Independent Power Engineers."

b.     Its title was false and misleading.

c.     It attached a false and misleading test report for "Transient stability issue in ETAP software case 00081."

d.     It provided a link to Defendants' false and misleading YouTube videos.

41.     Defendants' emails sent from the addresses stan.3626@gmail.com and muhummad.uhji@gmail.com were false and misleading in at least the following respects, without limitation:

a.     As explained above, these emails falsely purported to have been sent by dissatisfied former customers of ETAP, but they were really sent by Defendants.

b.     The email from "Stan" falsely asserted that a refinery had a "black out because of Wrong results in ETAP transient stability."

c.     The email from "Stan" falsely asserted that Stan's organization "had such problems in ETAP software and this is the reason we do not use ETAP software anymore."

d.     The email from "Muhammad" falsely asserted that his organization had experienced two shutdowns because of ETAP software and had replaced ETAP software.

42.     Defendants' purported test reports are false and misleading in that they purport to come from "Independent Power Engineers," an organization that does not exist and is

just a cover for unscrupulous and deceptive marketing activities by Defendants.  The test reports contain a false logo and motto to create the false impression of an organization that does not really exist, and they falsely identify their source as follows:

> Who are we?
>
> IPE (Independent Power Engineers) is a nonprofit organization passionate about the power engineering industry.  Our main mandate is to test and expose the different issues and dysfunctions of different power system simulation softwares.

43.  The assertions about ETAP software in Defendants' purported test reports are also false and misleading in multiple respects.  For example, in Defendants' Test Cases 1, 2, 4, 5, and 6, Defendants entered inaccurate, impractical, and absurd data into the ETAP program in order to create the false and misleading impression that ETAP has a defect causing load flow non-convergence.

a.  Defendants made it impossible for ETAP to function normally in these test cases by entering absurd values for the impedance and reactance of the hypothetical cable used in those tests.

b.  Defendants set the cable's resistance at an unrealistic value of 0.00005 ohms per kilometer.  There is no electrical cable in the world with such a low resistance. That resistance value might be obtained, for example, by using a copper cable with a diameter of 11.5 feet.  In contrast, the largest standard cable size manufactured today (2,000 kcmil) has a diameter of 1.5 inches.

c.  Defendants set the cable's reactance at 0.0, which is impossible.  The largest standard cable size manufactured today (2,000 kcmil) has a reactance of 2.57 mOhm/100ft.

d.  Defendants' use of impossible input values made it impossible for ETAP software to perform the necessary calculations to arrive at a load flow convergence. What Defendants did is equivalent to "testing" aircraft design software by entering a wing

**COMPLAINT**

span of six inches, a wing thickness of six feet, and an airspeed of zero and then claiming that the software "failed" when it cannot calculate performance characteristics of such an airplane.

e.     Further compounding the unreality of Defendants' purported tests, they set the cable length at 1.5 meters.  It is not normal to model such a short length of cable for modeling electrical power systems.  The losses and voltage drop for even 100 meters of 2000 kcmil cable are insignificant.  For this impossibly large cable diameter, reducing the length to 1.5 meters lowered the effective resistance from an already small 0.00005 ohms/km to an unworkably miniscule 0.000000075 ohms.

44.     As another example, Defendants' Test Cases 3 and 10 falsely and misleadingly purport to show that ETAP's motor-starting calculations do not converge and provide a solution.  But here again, Defendants have created a false appearance by entering inaccurate and impractical data into the ETAP program.

a.     Here again, Defendants set the cable's impedance at an unrealistic value that might be obtained by using copper cable with a diameter of 11.5 feet, instead of the maximum standard diameter of 1.5 inches.

b.     Here again, Defendants set the cable's reactance at 0.0, which is impossible.

c.     Defendants have set the sub-transient reactance (Xd") of the hypothetic generator used for their purported test as equal to its transient reactance (Xd').  That is impossible.  By definition, the sub-transient reactance of any generator must be less than its transient reactance.

d.     Further, Defendants used generator ratings for Test Cases 3 and 10 that are absurdly low.  The typical range for sub-transient reactance is 9% to 17%, and the typical range for transient reactance is 13% to 30%.  But Defendants have set both the sub-transient reactance and the transient reactance at 0.142%--at least 63% too low for sub-transient reactance and at least 93% too low for transient reactance.

20
**COMPLAINT**

45.     As still further examples, Defendants' Test Cases 7, 11, 12, 13, 21-28, 39-42, 46, 48-49, 56, 58, and 67 falsely and misleadingly purport to show that ETAP incorrectly provides different solutions when small changes are made to the cable length and/or load.

46.     These test cases reflect the use of a sophisticated understanding of voltage stability problems in load flow to create models that are misleading in a way that would not be evident to most customers reviewing these test cases.  Defendants have designed these ill-conditioned models with the clear intent of making it falsely look as if there is something wrong with ETAP.  But in fact, ETAP is working properly, and its varying results reflect the fact that the voltage stability problems Defendants have modeled, under the extreme conditions that they have included, can indeed lead to different outcomes based on the initial voltage values or system impedance variations.

47.     Determination of voltage stability limits requires an advanced calculation program called "Voltage Stability ("VS") software.  This special software is used to determine load flow results/solutions under various conditions.  In the VS program, system load and/or line/cable impedances are increased to determine and plot normal, overload, and unstable operating conditions.  Most users are not aware of the VS software since they use realistic system parameters and data.  Defendants have taken special steps to operate the system at its stability limit where a small change in a cable impedance would push the result to a different result/solution.

48.     Also, here again, Defendants have created a false appearance by entering inaccurate and impractical data—such as fictitious equipment ratings and very low initial voltage conditions—into the ETAP program.

49.     ETAP is preprogrammed with information allowing a user to select among normal cable and generator types and automatically bring up their typical parameters, such as cable diameter, resistance, and reactance.  In performing their purported tests, Defendants bypassed these normal parameters and manually entered parameters that were radically inaccurate, unrealistic, and even impossible.

50.     On information and belief, Defendants' use of such inaccurate and unrealistic parameters has been knowing and intentional, and they used such parameters for the conscious purpose of deceptively making ETAP appear to fail.

51.     As even more examples of the falsity of Defendants' purported test reports, Test Cases 58, 67, and 81 falsely and misleadingly purport to report on tests of Version 12.6 of ETAP software.  That version had not yet been released and was not available for Defendants to inspect or test.

52.     In addition, Test Case 81 is false and misleading because Defendants failed to model the generator excitation system.  That omission—which appears to be intentional—prevents the Automatic Voltage Regulator ("AVR") from working.  Absent that omission, the AVR would check, re-check and provide regulation and correction for the excitation system voltage level following a drop in voltage or fault in the system.  This is much like a car's cruise control feature, which checks and re-checks the vehicle's speed at regular intervals and makes changes to the system in order to maintain the desired speed.  The AVR does the same with regard to system voltage.  By not modeling the generator excitation system, Defendants prevented AVR action in Test Case 81, causing the supposedly inaccurate results.

53.     Each of Defendants' videos about ETAP software is false and misleading in purporting to come from "Independent Power Engineers."  The videos are also false and misleading in purporting to disclose defects in ETAP software.  The reasons for this include, without limitation, those set forth above.

54.     This is not the first time that CYME has made false allegations about ETAP. In 2005, CYME published a paper entitled "Calculation of Underground Cable Ampacity," which is still published on CYME's website at http://www.cyme.com/company/media/whitepapers/2005%2003%20UCA-FL.pdf.

55.     CYME's 2005 paper contained an assertion about ETAP that was false when CYME first made it and remains false today.  CYME said that "ETAP is [a] tabular

program." This assertion means that ETAP is less accurate and has limited applicability because it uses tables in determining cable ampacities. But in reality, as ETAP's website in 2005 clearly showed, ETAP was and is a graphical, user-friendly program with analytical thermal calculation methods based on NEC (Neher McGrath) and IEC 60287 standards.

56. ETAP notified CYME in or about 2005 or 2006 about the falsity of this statement. CYME never corrected it and continues to publish its paper containing this misstatement about ETAP.

## **DAMAGE TO ETAP**

57. Through many years of hard work and investment, ETAP has built a successful and highly regarded business. ETAP's rigorous and consistent attention to quality has earned it particularly high regard in the marketplace. ETAP's quality assurance program has passed multiple audits every year since 1991. As noted, ETAP has the only commercially available power engineering software that is certified for nuclear applications.

58. ETAP has spent 23 years building, refining, and maturing its Quality Assurance program to cultivate its software's reputation as a trusted quality product with proven results. ETAP software is considered globally as the benchmark of the power system industry. It has taken years to get to the point where "ETA" is synonymous with "Quality" and where consumer confidence in the accuracy of its results is a given within the industry. Defendants' false and misleading representations are damaging what has taken ETAP many years to build.

59. Because of the high quality and reputation of ETAP's software, CYME has faced increasing competition in providing power systems analysis software for use in the electrical distribution sector. Defendants' deceptive campaign attacking the quality of ETAP's software is strategically calculated to undermine ETAP's greatest competitive strength.

60.   ETAP has been contacted by many customers concerned about Defendants' false and misleading representations.  While some customers have seen through Defendants' deceptions, ETAP is informed and believes, and on that basis alleges, that Defendants' deceptive campaign has harmed the reputation, goodwill, volume, and profitability of ETAP's business.

61.   Further, as recently as February 2014, ETAP has experienced difficulties competing with CYME because a customer was concerned about false and misleading representations about ETAP in CYME's 2005 paper.

62.    On information and belief, Defendants—including CYME—have unfairly benefitted from their deceptive smear campaign against ETAP.

63.   ETAP has repeatedly notified Defendants of the falsity of their representations about ETAP software and has demanded that Defendants stop publishing these falsehoods.

a.   For example, ETAP notified "Independent Power Engineers" by email on July 10, 2013, about the unrealistic assumptions (detailed above) in the tests that purported to show load flow divergence and motor starting divergence.

b.   On August 5, 2013, attorneys representing ETAP notified Amir Aslani, IPET-CO, and Cooper Power Systems LLC by letter about Defendants' false and misleading emails, attachments, test reports, and YouTube videos.

c.   On March 20, 2014, ETAP's General Counsel notified Aslani, IPET-CO, and CYME by letter about Defendants' false and misleading emails, YouTube videos, and web site postings and demanded that they cease and desist.

64.   Despite these notices and warnings, Defendants have not corrected or retracted any of their false and misleading representations about ETAP software.  Instead, Defendants have continued to deceive customers for power engineering software and to dishonestly attack ETAP's reputation.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST CLAIM FOR RELIEF

### (False Representations in Violation of the Lanham Act, 15 U.S.C. § 1125(a))

65.    ETAP incorporates here by reference all the preceding allegations of this Complaint.

66.    As was alleged above, Defendants CYME, IPET-CO, Aslani, and Does have made and used false and misleading descriptions of fact and false and misleading representations of fact (collectively, "Misrepresentations").  Defendants' Misrepresentations have violated the federal Lanham Act, 15 U.S.C. § 1125(a).

67.    Defendants' Misrepresentations have been used in interstate and international commerce.  They have been distributed over the Internet and in international email communications (and, on information and belief, in international telephonic communications) with customers and potential customers in the United States and in countries around the world.

68.    Defendants' Misrepresentations have been made in the course of commercially and broadly promoting and advertising Defendants' products.

69.    Defendants' Misrepresentations materially misrepresent the nature, characteristics, and qualities of ETAP products.  Defendants' Misrepresentations materially misrepresent the nature, characteristics, and qualities of the Defendants' commercial activities and services purportedly provided by "independent" testing services; and Defendants' Misrepresentations materially misrepresent the nature, characteristics, and qualities of the Defendants' products by misrepresenting that the Defendants' products offer advantages over supposedly defective ETAP products.

70.    ETAP is informed and believes, and on that basis alleges, that Defendants have profited or are likely to profit from their Misrepresentations—including through sales of their products or services.  Defendants should be required to disgorge all such profits under 15 U.S.C. § 1117(a)(1).

71.    ETAP has been injured and will be injured by Defendants' Misrepresentations.

For example, ETAP is informed and believes, and on that basis alleges, that it has lost or is likely to lose profits from business diverted from ETAP to Defendants by the Misrepresentations and that the Misrepresentations have diminished ETAP's reputation and goodwill.   In addition, ETAP has been damaged in the amount reasonably required for corrective advertising and other activities to offset the false beliefs created by Defendants' Misrepresentations.  ETAP has not yet ascertained the exact amount of its damages, but ETAP is informed and believes, and on that basis alleges, that the amount is in excess of $10,000,000.  ETAP is entitled to an award of all such damages under 15 U.S.C. § 1117(a)(2).

72.   Defendants' Misrepresentations have been willful, and the circumstances of this case justify an award of treble or other enhanced damages under 15 U.S.C. § 1117(a).

73.   Defendants' Misrepresentations have caused and are causing irreparable injury to ETAP.   ETAP is informed and believes, and on that basis alleges, that the Misrepresentations will result in further irreparable injury if Defendants are not enjoined to cease, desist from, retract, and correct the Misrepresentations.  ETAP is entitled to such an injunction under 15 U.S.C. § 1116(a).

74.   This is an exceptional case, and ETAP should recover its attorneys' fees and litigation expenses under 15 U.S.C. § 1117(a).

## **PRAYER FOR RELIEF**

ETAP requests the following relief from each Defendant:

1.   Preliminary and permanent injunctions prohibiting Defendants, their officers, agents, servants, employees, licensees, subsidiaries, and all other persons or entities acting or attempting to act in active concert or participation with any of them or on their behalf from disseminating any false or misleading statements or documents concerning ETAP or its products, including but not limited to the Misrepresentations alleged in this Complaint;

2.   Preliminary and permanent injunctions requiring Defendants to clearly,

prominently, and effectively retract and correct their false and misleading statements and documents concerning ETAP and its products, including but not limited to the Misrepresentations alleged above;

3.     Judgment against each of Defendants, in an amount to be proven but no less than $10,000,000, for all damages sustained by ETAP or its products, from the Misrepresentations and other misconduct alleged in this Complaint, including ETAP's lost profits, the diminishment of ETAP's reputation and goodwill, and the costs of ETAP's efforts to prevent or limit further damage from the Misrepresentations and other misconduct;

4.     An accounting for, and disgorgement of, all profits of any kind attributable to the Misrepresentations and other misconduct alleged in this Complaint;

5.     A determination that Defendants' misconduct has been willful and that this case is exceptional under 15 U.S.C. § 1117(a);

6.     Treble damages under 15 U.S.C. § 1117(a);

7.     Attorney's fees and litigation expenses under 15 U.S.C. § 1117(a) and any other applicable laws or doctrines;

8.     Costs of suit;

9.     Pre-judgment and post-judgment interest on all amounts awarded; and

10.    Any other appropriate relief.

Dated:  June 30, 2014                    **ONE LLP**

By: _____
       William J. O'Brien

Attorneys for Plaintiff,
Operation Technology, Inc.

1

## DEMAND FOR JURY TRIAL

Plaintiff, Operation Technology, Inc., hereby demands trial by jury of all issues so triable under the law.

Dated:  June 30, 2014

**ONE LLP**

By: _____
William J. O'Brien

Attorneys for Plaintiff,
Operation Technology, Inc.

28
**COMPLAINT**